**LEFLORE BROADCASTING COMPANY, INC. (WSWG–AM) Greenwood, Mississippi,**

**and**

**Dixie Broadcasting Company, Inc. (WSWG–FM) Greenwood, Mississippi, Appellants,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION.**

**No. 78–1677.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 12, 1979.

Decided June 5, 1980.

Lee W. Shubert, Washington, D. C., with whom Forbes W. Blair, Washington, D. C., was on the brief, for appellants.

James R. Jamison, Jr., counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Assoc. Gen. Counsel and Keith H. Fagan, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge and GREENE *, United States District Court Judge for the District of Columbia.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

Leflore Broadcasting Co., Inc. (Leflore) and Dixie Broadcasting Co., Inc. (Dixie), the licensees respectively of WSWG–AM and WSWG–FM in Greenwood, Mississippi, bring this appeal from a decision of the Federal Communications Commission (FCC) denying their license renewal applications. We affirm.

## I. BACKGROUND

(A) *Facts.* Dixie is the original licensee of FM Radio Station WSWG, which it constructed in 1965. Leflore acquired WSWG–AM (then WLEF) in 1969.[1] Although Leflore and Dixie are separate corporations, the principals of the two corporations are, and have been, identical.[2]

Before it was acquired by Leflore, WSWG–AM featured top-40 programming. However, in its 1969 application for assignment, Leflore proposed changing the format to "primarily Negro, contemporary, Rhythm and Blues."[3] This new format, it said, would afford a service not previously available to the large Black population of the city of Greenwood and Leflore County.[4] Indeed, WSWG–AM would be the "only primarily Negro programmed station in the city or county . . . ."[5] To implement its plan, Leflore hired both a general manager and a station manager who ostensibly had extensive experience in Black oriented programming.[6]

In its 1970 license renewal application, Leflore committed WSWG–AM to specified

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. WLEF was acquired by assignment. Following the assignment, the call letters for the station were changed from WLEF to WSWG, and the call letters for the FM station were modified to WSWG–FM.

2. From February 25, 1970, to March 30, 1973, Charles D. Saunders was President, a director and a 75% stockholder, while James McCullough was Vice-President, a director, and 25% stockholder. Prior to February 1970 and subsequent to March 1973, Mr. Saunders was 100% stockholder in both Leflore and Dixie.

Throughout, the day-to-day operation of the stations, as well as policy determinations, were in the hands of Mr. McCullough as general manager of the stations.

3. Leflore Broadcasting Company, Inc., 66 F.C. C.2d 734, 738 (1975).

4. The city of Greenwood is almost 50% Black. Leflore County is almost 60% Black. *Id.*

5. *Id.* at 738.

6. *Id.* at 739.

amounts of weekly "non-entertainment"[7] programming: 8 hours, 4 minutes of news; 4 hours, 10 minutes of public affairs; and 7 hours, 56 minutes of other non-entertainment material.[8] It also reiterated the station's commitment to the Black community, and pledged itself to continue the rhythm and blues format.[9]

The latter pledge notwithstanding, Leflore, by a letter dated March 17, 1971, notified the Commission that it had changed its format from rhythm and blues to country and western.[10] The letter explained that the station had lost $20,000 in calendar year 1970, and that the change to country and western was "necessary if [the station was] to economically survive."[11] At the same time, Leflore dismissed one full-time and two part-time Black announcers and replaced them with one full-time and one part-time white announcer.

These moves prompted a citizens' group to request Commission action.[12] Based upon this citizens' petition and its own field investigation, the FCC ordered Leflore to file its renewal application early.[13] The Commission announced that the focus of this expedited inquiry would be: (1) whether Leflore had carried out the representations made in its 1970 renewal application

regarding non-entertainment programming; (2) whether Leflore had made misrepresentations to the Commission in its 1970 application or in subsequent statements; and, (3) whether Leflore's dismissal of the three Black employees violated the Commission's equal employment opportunity (EEO) rules.[14]

After receiving Leflore's renewal application, the Commission issued a Memorandum Opinion and Order in which it set for consolidated hearing the license renewal applications both of WSWG–AM (Leflore) and of WSWG–FM (Dixie).[15] By this time, WSWG–AM had abandoned its experiment with a country and western format and had adopted the "middle-of-the-road" programming of WSWG–FM. The two stations were simulcast, and the staffs were commingled. Therefore, Leflore and Dixie relied upon the same written and oral presentations in the renewal proceedings.[16] The Commission designated seven issues for the hearing:

(1) To determine whether Leflore Broadcasting Company, Inc., has carried out in good faith the representations made in its 1970 renewal application as to proposed non-entertainment programming;

---

7. FCC Form 303 defines "Non-Entertainment Programs" to include: News, Public Affairs and other programming exclusive of Entertainment and Sports. It further defines "Public Affairs Programs" to include: talks, commentaries, discussions, speeches, editorials, political programs, documentaries, forums, panel roundtables, and similar programs primarily concerning local, national and international public affairs.

8. 66 F.C.C.2d at 740.

9. *Id.* At the time, the music played on WSWG–AM was 95% Rhythm and Blues, 3% pop, and 2% religious.

10. *Id.* at 737–38. The FCC does not dispute the licensee's discretion to change its format; therefore, Leflore's format change *per se* is not an issue here. 36 F.C.C.2d at 103. *See also* 65 F.C.C.2d at 565. The FCC appeals to the format change only insofar as it is evidence of the licensee's lack of veracity in dealing with the Commission.

11. 66 F.C.C.2d at 738.

12. The citizens' group consisted of three former employees of WSWG–AM, the pastor of a predominantly Black church in Greenwood, a Black businesswoman, and a group called the Greenwood Movement which was a coalition of civil rights organizations in Greenwood.

13. Leflore Broadcasting Co., Inc., 36 F.C.C.2d 101 (1972).

14. 47 C.F.R. § 73.125 (1972); 47 C.F.R. § 73.301 (1972).

15. Leflore Broadcasting Co., Inc., 46 F.C.C.2d 980 (1974). The license renewal application for WSWG–FM had been filed in due course on March 5, 1973.

16. 66 F.C.C.2d at 759. Leflore operated WSWG–AM as a country and western station for barely two months. On May 3, 1971, WSWG began simulcasting the programming of WSWG–FM, which had a middle of the road format.

(2) To determine in light of the evidence adduced under the preceding issue, whether applicant made misrepresentations to the Commission or was lacking in candor;

(3) To determine whether the applicants or their principals made misrepresentations to the Commission or were lacking in candor in other written submissions to the Commission;

(4) To determine whether the applicants violated [the equal employment opportunity provisions] of the Commission's Rules;

(5) To determine whether the change in entertainment format on WSWG(AM) was, as claimed by the licensee, financially necessary;

(6) To determine the extent and nature of the applicants' proposed non-entertainment programming and whether that proposal adequately serves the ascertained problems, needs and interests of the community, as evaluated;

(7) To determine, in light of the evidence adduced under the preceding issues, whether the applicants have the requisite qualifications to be or to remain Commission licensees, and whether a grant of the application would serve the public interest, convenience and necessity.[17]

The *Initial Decision*[18] of the Administrative Law Judge (ALJ) found against the licensees on all issues, and determined that a grant of the renewals would not serve the public interest. Leflore and Dixie filed exceptions to this *Initial Decision*. Oral argument before the Commission *en banc* was held on December 6, 1976. And, on July 13, 1977, the Commission affirmed the ALJ's decision, making only minor modifications.[19] Leflore and Dixie filed a petition for recon-

sideration, which was denied.[20] This appeal followed.

(B) *Legal Context.* In the early days of broadcasting, it was thought that "[w]ith everybody on the air, nobody could be heard."[21] Therefore, in the name of orderly broadcasting, the Federal Communications Act of 1934 limited the number of voices on the air by establishing a licensing scheme. This created a scarcity which, in turn, generated a need for government supervision to ensure a robust marketplace of ideas. Consequently, the Act imposes upon broadcasters an affirmative obligation to program "in the public interest." A failure to do so places the broadcaster's license at peril.

The danger of this scheme is the risk it poses to cherished First Amendment freedoms. When the right to continue to operate a lucrative broadcast facility turns on periodic government approval of the *type* of broadcasting done, the right of the media to be free from government control over the content of speech is in constant jeopardy.[22] There is no question that such content-based regulation in any context other than broadcasting would seriously offend the First Amendment. But, the "different" nature of the broadcasting industry has been invoked to justify forms of content-based regulation in this context.

The rationale most frequently advanced for varying the First Amendment treatment of newspapers and broadcast stations—the relative scarcity of broadcast frequencies—is increasingly open to dispute.[23] There are today far more broadcast stations than daily newspapers, and the disparity is increasing. And, while most towns are served by more than one radio station,

**17.** 46 F.C.C.2d at 985.

**18.** Leflore Broadcasting Company, Inc., 66 F.C. C.2d 734 (1975).

**19.** Leflore Broadcasting Company, Inc., 65 F.C. C.2d 556 (1977).

**20.** Memorandum Opinion and Order, FCC 78–432 (July 20, 1978).

**21.** *National Broadcasting Co. v. FCC,* 319 U.S. 190, 212, 63 S.Ct. 997, 1007, 87 L.Ed. 1344 (1943).

**22.** *See generally Citizens' Committee to Save WEFM v FCC,* 506 F.2d 246, 268 (1974) (en banc) (Bazelon, J., concurring).

**23.** *Bazelon, FCC Regulation of the Telecommunications Press,* 1975 Duke L.J. 213, 223 (1975).

there is serious competition between two newspapers in only 10 American cities.[24] Moreover, significant advances in technology have already occurred—and more are coming. In the not too distant future, new technologies presumably will increase the number of broadcasting avenues, thereby eliminating a major part of the justification for the special constitutional regime applied to broadcast speech. Only constant vigilance can ensure that the legal scheme reflects the realities of ever-changing technologies and values. It is still true that "awareness [of the latent conflicts] is our best protection against falling into the abyss of dogmatism."[25]

Despite these new developments, there is not yet a sufficient consensus that technology exists sophisticated enough to warrant abandoning the present regulatory system. Until such a consensus develops, our nation will be forced to suffer the tension between ensuring the orderly use of the airwaves, on the one hand, and protecting the broadcast media from chilling government interference on the other.[26] It cannot be gainsaid that, under present doctrine, the FCC is empowered to refuse to renew the license of a broadcaster who has failed to operate its facility "in the public interest."[27] Therefore, the question posed by this case is simply whether, in this instance, the Commission has sufficiently identified and articulated reasons for denying the application of Leflore and Dixie.[28]

## II. ANALYSIS

(A) *The Variation in Non-Entertainment Programming.* The ALJ found the following comparison between the "non-entertainment" programming proposed by Leflore in its 1970 application for renewal and the actual programming of WSWG during the "composite week":[29]

| Type | 1970 Proposed | 1972 Actual |
|------|---------------|-------------|
| | hours:minutes | hours:minutes |
| News | 8:04 | 8:37 |
| Public Affairs | 4:10 | 0:43 |
| Other | 7:56 | 8:28 |

There was an evident shortfall in the amount of time devoted to "public affairs" programming—less than 20% of the time promised for this category was actually broadcast.[30] As a result, there existed an overall shortfall in the "non-entertainment" category—only 85% of the promised "non-entertainment" time was actually broadcast. Moreover, the ALJ found that these shortfalls were not unique to the "composite week" chosen; they existed throughout the renewal period.[31] Many promised non-entertainment programs (including religious, educational, and children's shows)

---

**24.** Wall Street Journal, April 30, 1980, at 1, col. 1.

**25.** *Citizens' Committee to Save WEFM v. FCC,* 506 F.2d 246, 252 (D.C.Cir.1973), *vacated on rehearing en banc,* 506 F.2d 252 (D.C.Cir.1974).

**26.** The author of this opinion, speaking only for himself, is of the view that the way to avoid the Hobson's choice inevitable in the present regulatory scheme is to move away from "behavioral" regulation toward what might be called "structural" regulation of the media. The former approach scrutinizes the conduct of the licensee, as the FCC does today. The latter approach would employ antitrust concepts, limitations on cross-ownership, and the like to insure diversity in broadcasting while minimizing government attention to broadcast content. *See,* Bazelon, *The First Amendment and the "New Media"—New Directions in Regulating Telecommunications,* 31 Fed.Commun.L.J. 212–13 (1979).

**27.** *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 137–38, 60 S.Ct. 437, 438–39, 84 L.Ed. 656 (1939). *See also NBC v. United States,* 319 U.S. 190, 215–16, 223–24, 63 S.Ct. 997, 1012–13, 87 L.Ed. 1344 (1942); *Continental Broadcasting Company v. FCC,* 439 F.2d 580 (D.C. Cir.1971).

**28.** *FTC v. Crowther,* 430 F.2d 510, 514 (D.C.Cir. 1970).

**29.** 66 F.C.C.2d at 770.

**30.** It may be that the time devoted to public affairs broadcasts during the composite week was actually even less than the 43 minutes claimed by Leflore. The Commission's initial analysis of the station's logs revealed only 5 minutes of public affairs time. Leflore Broadcasting Co., Inc., 46 F.C.C.2d at 932 (1974).

**31.** 66 F.C.C.2d at 771–72.

were never broadcast at all,[32] and no suitable substitutes were provided.[33] And, many of the programs cited by Leflore as evidence of its compliance were not broadcast until after the citizens' group had filed its complaint against the station.[34] Based upon this record, the ALJ concluded that Leflore had "not substantially carried out in good faith the representations it made in its 1970 renewal application as to proposed non-entertainment programming."[35] The Commission agreed.[36]

In its instructional materials for licensees,[37] the Commission defines a "substantial" variation from programming commitments as follows:

> [A] substantial variation is an actual decrease of 15 percent in *any* of the three non-entertainment program categories (that is, news, public affairs, and all other programs, exclusive of entertainment and sports) *or* a combined 20 percent decrease in these three program categories.[38]

Here, the decrease in Leflore's public affairs programming was at least 80%,[39] and the combined decrease in its non-entertainment programming was at least 15%. Therefore, under the Commission's guideline a "substantial" variation existed.

Citing *Southern Broadcasting Co.*,[40] Leflore argues that in the past the FCC has permitted greater deviation from promised programming than the deviation present here.[41] The Commission did in fact find in *Southern Broadcasting* that the licensee had substantially effectuated its program proposals in spite of the fact that the average amount of time actually devoted to "local" programming was 16.6% less than the amount promised.[42] But this finding was not the product of a study of the raw numbers standing alone.[43] It was based upon a detailed analysis by the ALJ of the programs that were promised and those that were performed.[44] This analysis led the ALJ to conclude: (1) that none of the programming changes made by Southern was basic; (2) that the station's actual overall program mix resembled its proposal reasonably closely; (3) that no category of "local" programming had been abandoned or neglected; and, perhaps most importantly, (4) that none of the programming changes was unexplained.[45]

In the instant case, just as in *Southern Broadcasting*, the Commission's consideration went beyond "a mere percentage test."[46] But, while in *Southern Broadcasting* further consideration revealed a good faith effort by the licensee to deliver promised programming, here further con-

---

**32.** *Id.* at 772–73. Of all the programs promised by Leflore in 1970, only one was broadcast throughout the renewal period. Moreover, even that program was off the air for four months and, when aired, was broadcast fewer times per day than had been promised. *Id.* at 776.

**33.** *Id.* at 777.

**34.** *Id.* at 773–74.

**35.** *Id.* at 777.

**36.** 65 F.C.C.2d at 560.

**37.** Instructional Pamphlet for FCC Form 303–R.

**38.** *Id.* at Question 16 (emphasis added).

**39.** *See* note 24 *supra.*

**40.** 57 F.C.C.2d 891, aff'd mem., sub nom. *Furniture City Television Company, Inc. v. FCC*, 551 F.2d 467 (D.C.Cir.1976).

**41.** Appellant's Reply Brief at 9, 38–40.

**42.** 57 F.C.C.2d at 897.

**43.** *Id.*

**44.** Southern Broadcasting Company, 57 F.C.C.2d 901, 903–12 (1974). In a related context, the FCC has rejected exclusive reliance on quantitative guidelines. Report and Order, Formulation of Policies Relating to the Broadcast Renewal Applicant, 66 F.C.C.2d 419 (1977) (quantitative standards are a "simplistic, superficial approach to a complex problem and we will not adopt them"). *See also National Black Media Coalition v. Federal Communications Commission*, 589 F.2d 578 (D.C.Cir.1978). There is no indication that the Commission relied exclusively on quantitative guidelines in either *Southern Broadcasting* or the case at hand.

**45.** 57 F.C.C.2d at 940.

**46.** 65 F.C.C.2d at 559. *See* note 44 *supra.*

sideration revealed that Leflore had failed substantially to carry out the programming policies embodied in its 1970 proposal *and* had failed to explain or justify the variations.[47] These findings, meticulously catalogued and analyzed by the ALJ,[48] form the basis of the Commission's determination regarding Leflore's performance.

Licensees must be permitted to exercise discretion in programming. The First Amendment requires at least this much. It also serves the public interest for broadcasters to adapt their programming to changed circumstances.[49] But, given a licensing scheme, licensees cannot disregard programming commitments made to the Commission with little—or no—explanation. If licensees were permitted to trifle with such commitments, the licensing process would be rendered nugatory.[50] Therefore, given the state of the law and given the facts of this case, we cannot say that it was unreasonable or contrary to law for the FCC to conclude that Leflore and Dixie had failed to comply with the programming representations they had made in the 1970 renewal application.

(B) *Misrepresentations and Lack of Candor.* The ALJ found the conclusion inescapable "that Leflore's 1970 renewal application [was] replete with misrepresentations."[51] In part, this conclusion was an extension of his determination that Leflore had failed to make a good faith effort to carry out its 1970 programming representations.[52] So many of those promises were never fulfilled, and so many were effectuat-

ed only after the license was in jeopardy, that the ALJ concluded that Leflore never intended to honor the pledges it made in 1970.[53]

The ALJ also perceived a lack of candor in submissions other than Leflore's 1970 renewal application. Indeed, his ultimate conclusion that Leflore and Dixie sought to deceive the Commission was based upon his analysis of all of the licensees' submissions taken together. In the judge's view, Leflore's statement that WSWG would be "the [only] station in the area programmed to meet the needs of the black community"[54] epitomized its less than forthright attitude. The assertion first appeared in Leflore's 1969 assignment application, along with the allegation that the white minority of Greenwood was already served by three other stations and that WSWG "cannot add anything to this service."[55] Leflore said it perceived a "gigantic need" for local news from the Black community, for Black-oriented music, and for a means for Blacks to express themselves.[56] The licensee reiterated its "unique" role in its 1970 renewal application. Yet, when in the instant proceeding the ALJ questioned Leflore and Dixie about the apparent lack of Black-oriented programming on WSWG throughout the renewal period, the licensees contended that "it is virtually impossible to separate the needs and interests of a specific ethnic group of the population of Greenwood and Leflore County from the needs of the entire community."[57] This assertion is flatly contradicted by testimony of the general mana-

---

47. 65 F.C.C.2d at 559–60; 66 F.C.C.2d at 770.

48. 66 F.C.C.2d at 749–51, 770–77.

49. The Commission has long recognized this principle. *See, e. g.,* Lexington Country Broadcasters, Inc., 41 F.C.C.2d 760 (1973); KORD, Inc., 31 F.C.C. 85 (1961).

50. This certainly has been the case since the Commission's 1965 Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393 (1965), in which the Commission demanded seriousness regarding promises of programming in no uncertain terms:
    Do not puff; there will be no further preferences given on these overblown proposals. We want serious, solid proposals which will

not be in issue at the hearing, but as to which there must be effectuation.
    *Id.* at 398.

51. 66 F.C.C.2d at 778.

52. *Id.* at 777.

53. *Id.* at 781.

54. *Id.* at 778.

55. *Id.*

56. *Id.* at 781.

57. *Id.* at 778.

ger of WSWG, one of the principals of Leflore and Dixie, that special needs of the Black community persist in the area.[58] In this light, the ALJ concluded that the licensees' submissions were "so inconsistent in no many important areas that [they were] unworthy of belief." [59]

The ALJ listed additional instances of deception. Leflore promised to seek out Black high school students for on-the-job training, yet the recruitment effort was nil, and only one such student was trained.[60] Leflore never aired a promised weekly talent show for Blacks.[61] Nor did it ever air a monthly forum on Black problems which it promised when it moved away from its rhythm and blues format to country and western.[62] The ALJ felt that this repeated lack of effort betrayed a lack of intent to deliver on promises made to the Commission.

Finally, without considering the issue of whether the change of format from rhythm and blues was *per se* in the public interest, the ALJ analyzed the credibility of Leflore's representation that the change was made out of financial necessity. He found that the available financial data belied this explanation.[63]

Based upon this extensive catalogue of what he found to be deliberate misstatements, and based upon his observation of the demeanor of the principals of Leflore and Dixie,[64] the ALJ concluded that the licensees "never intended to fulfill the representations . . . made in 1969 and thereafter," and that misrepresentation and lack of candor permeated the submissions of Leflore and Dixie.[65] The Commission fully adopted this conclusion.[66]

■ Ever since the Supreme Court's decision in *Federal Communications Commission v. WOKO, Inc.,*[67] it has been clear that the Commission may refuse to renew a license where there has been willful and knowing misrepresentation or lack of candor in dealing with the Commission. Because effective regulation is premised upon the agency's ability to depend upon the representations made to it by its licensees, "[t]he fact of concealment [is] more significant than the facts concealed." [68] Indeed, the FCC would be derelict if it did not hold broadcasters to "high standards of punctilio," [69] given the special status of licensees as trustees of a scarce public resource.[70]

Leflore and Dixie correctly note that the Commission has said that a demonstration of an "intent to deceive" is "a *sine qua non* of a misrepresentation issue." [71] They ar-

**58.** *Id.* at 781.

**59.** *Id.*

**60.** *Id.* at 779–80.

**61.** *Id.* at 780.

**62.** *Id.*

**63.** *Id.* at 786–89.

**64.** *Id.* at 779.

**65.** *Id.* at 781. Leflore and Dixie argued that they were guilty only of over-promising. Appellants' Brief at 52; Reply Brief at 16. However, both the ALJ and the Commission considered in detail and dismissed the "mitigating circumstances" advanced by the licensees. We find no basis to upset their conclusion in this regard.

**66.** 65 F.C.C.2d 560–61, 565.

**67.** 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946). *See also WADECO, Inc. v. FCC,* 628 F.2d 122 (D.C.Cir.1980); *Continental Broadcasting v. FCC,* 439 F.2d 580 (D.C.Cir.1971); *Lorain Journal Co. v. FCC,* 351 F.2d 824 (D.C. Cir.1965), *cert. denied sub nom. W.W.I.Z., Inc. v. FCC,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966); *Immaculate Conception Church of Los Angeles v. FCC,* 320 F.2d 795 (D.C.Cir. 1963), *cert. denied,* 375 U.S. 904, 84 S.Ct. 196, 11 L.Ed.2d 145 (1963).

**68.** *FCC v. WOKO, Inc.,* 329 U.S. 223, 227, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946).

**69.** *Lorain Journal Co. v. FCC,* 351 F.2d 824, 830 (D.C.Cir.1965).

**70.** *Cf. Sea Island Broadcasting v. FCC,* 627 F.2d 240, at 244 (D.C.Cir.1980).

**71.** CBS, Inc., 49 F.C.C.2d 1214, 1223 (1974). *Cf.* Media Properties, Inc., 43 R.R.2d 1563, 1566 (1978) (finding that no misrepresentation existed where a licensee could reasonably have felt its statements were true).

gue · that "the Commission's decision is devoid of any evidence of a knowing intent to deceive."[72] This argument ignores *both* the nature of the findings of the ALJ and the Commission in this case *and* the special nature of the obligation of honesty that a licensee owes to the FCC.

Normally, the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity would be enough to justify a conclusion that there was fraudulent intent. In the instant case, the findings of the ALJ inherently incorporate these elements. For example, the finding that Leflore and Dixie *never intended* to fulfill their programming promises necessarily entails the corollary finding that they intended to deceive the Commission. The ALJ documented this finding in comprehensive detail.

■ If any departure in the requisite proof were warranted here, it would be toward a less rigorous test. Where public policy demands complete and accurate disclosure by the submitter, as it does in this case, it may suffice to show nothing more than that the misrepresentations were made with disregard for their truth.[73] Thus, for example, we have held that principals will be held accountable for deceptions perpetrated by their subordinates.[74] We need not reach this issue here, however. Even on the more demanding standard for intent, there is substantial evidence in the record to support the Commission's finding that the submissions of Leflore and Dixie contained misrepresentations and lacked candor. Therefore, the agency's conclusion must be sustained.

(C) *Other Violations.* The Commission found that "especially in view of the uncommon 'racial makeup of the community and area,' Leflore made no serious attempt to comply with [the FCC's] affirmative action requirements."[75] Under the FCC's EEO rules, the licensee is required to adduce evidence of compliance with the program.[76] But the Commission found that "[t]he record [was] devoid of such proof" in this case.[77] Therefore, it concluded that Leflore was in violation of the EEO rules.[78]

The Commission also found that the nonentertainment programming proposed by Leflore and Dixie in their 1972 renewal application (the one under consideration in the instant proceeding) had not been shown to be adequate to the needs of the Greenwood-Leflore County listening public revealed in their 1972 ascertainment study.[79] On appeal, Leflore and Dixie do not dispute these two findings by the Commission.[80]

72. Appellants' Brief at 44.

73. *Cf. Am-Chi Restaurant, Inc. v. Simonson,* 396 F.2d 686 (D.C.Cir.1968).

74. *See, e. g., Continental Broadcasting, Inc. v. FCC,* 439 F.2d 580 (D.C.Cir.1971). *Cf. WADE-CO, Inc. v. FCC,* 628 F.2d 122 (D.C.Cir.1980).

75. 65 F.C.C.2d at 563. The Commission's rules, §§ 73.125 and 73.301, read the same way, except that the former applies to AM stations, the latter to FM stations: "Equal opportunity in employment shall be afforded by all licensees or permittees of commercially or non-commercially operated [stations] to all qualified persons, and no person shall be discriminated against in employment because of race, color, religion, national origin, or sex."

76. Triple X Broadcasting Co., Inc., 51 F.C.C.2d 585 (1975).

77. 65 F.C.C.2d at 564.

78. *Id.* The Commission found it unnecessary to decide whether the discharge of the 3 black announcers in connection with the change of format constituted discrimination. *Id.* at n.21. The ALJ did address the firing, and he found a violation of the EEO rules. He noted that the announcers were given no opportunity to prove their ability to handle the country and western format, and that there was no evidence in the record that a particular type of music requires a particular type of disc jockey who qualifies as a specialist. The ALJ felt that Leflore's action was tantamount to a statement that a person's capability is a function of the color of his skin. He concluded that Leflore had not shown that the discharges were based upon job performance. 66 F.C.C.2d at 783–85.

79. *Id.* at 567.

80. Reply Brief at 15–16. The appellants made no mention of either of these two findings in their initial brief. In their Reply Brief, the appellants argued only that neither finding would justify denial of the station's license renewal application. *But see* note 83, *infra.*

Leflore and Dixie did argue that they were not accorded a full and fair administrative

Consequently, they are not before us, and we reserve judgment on them.

■ (D) *The Weight of the Issues.* We have made it clear in earlier cases that "the choice of remedies and sanctions is a matter wherein the Commission has broad discretion." [81] The Supreme Court has said that "the Commission is [not] bound . . . to deal with all cases at all times as it has dealt with some that seem comparable." [82] Therefore, in assessing a penalty against Leflore and Dixie for any of the violations found in the proceeding below, it is beyond cavil that the FCC enjoyed wide latitude. [83]

■ This broad discretion does not eliminate the FCC's burden to express clearly the basis of its action. Where several violations are found, the Commission should set forth the role each plays in the assessment of penalty. Rarely should the agency be permitted to take a "gestalt" approach, one based upon a reaction to the "overall" situation rather than to each violation one at a time. Only by requiring the Commission to articulate the importance of the factors that affect its decision can we guarantee that the agency itself is fully cognizant of their relative weight. Only through such a requirement can we provide an effective basis for judicial review.

In the case at hand, therefore, the Commission should have delineated which of the various transgressions, or combinations of transgressions, perpetrated by Leflore and Dixie was conclusive to its determination that the license renewal application should be denied. It did not. In some cases, this would dictate remand to the Commission

for further proceeding. However, in this case the Commission made clear that the "misrepresentations, *standing alone*, would be sufficient grounds for the denial of the renewal applications." [84] Because we have found no reason to disturb the agency's finding that the submissions of Leflore and Dixie to the Commission contained misrepresentations, and because the agency indicated that this factor alone would cause it to invoke the sanction exacted, remand is not necessary in this case.

## CONCLUSION

The Commission's performance in this case was flawed, especially in its failure to articulate the relative importance of its findings to the ultimate denial of the renewal applications. Nonetheless, we cannot find the denial arbitrary or capricious in light of the finding of a pattern of misrepresentation, a violation which by itself would have prompted the Commission to revoke the licenses of Leflore and Dixie. Accordingly, we affirm.

*So ordered.*

hearing as required by the due process clause. The case, they say, was charged from the outset with significant racial overtones. Appellants' Brief at 53–69. We find nothing in the record to support this claim.

**81.** *Lorain Journal Co. v. FCC,* 351 F.2d 824, 831 (D.C.Cir.1965), *cert. denied sub nom. W.W.I.Z., Inc. v. FCC,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). *See also Continental Broadcasting v. FCC,* 439 F.2d 580, 583 (D.C. Cir.1971).

**82.** *FCC v. WOKO,* 329 U.S. 223, 228, 67 S.Ct. 213, 215, 91 L.Ed. 204 (1946).

**83.** Any one of the violations found against Leflore and Dixie *might,* given the proper case, justify denying a licensee's renewal application. Leflore and Dixie dispute this with regard to EEO violations as a class, but the case law is to the contrary. *See, e. g., Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,* 595 F.2d 621, 628–31 (D.C.Cir.1978) (en banc). We do not decide whether the violations alleged in this case would warrant denying the renewal application.

**84.** 65 F.C.C.2d at 561–62 (emphasis added).