**MEREDITH CORPORATION,
Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Syracuse Peace Council, CBS, Inc.,**

**Radio-Television News Directors Association, et al., Democratic National Committee, et al., National Broadcasting Company, Inc., Intervenors.**

**No. 85–1723.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1986.

Decided Jan. 16, 1987.

As Amended Jan. 16 and Feb. 10, 1987.

Floyd Abrams, with whom Dean Ringel, Michael H. Bader, John M. Pelkey, Melodie A. Virtue, James E. Dunstan and Thomas G. Fisher were on the brief, for petitioner. Richard M. Riehl entered an appearance, for petitioner.

Jack D. Smith, General Counsel, F.C.C., with whom Daniel M. Armstrong, Associate General Counsel, C. Grey Pash, Jr., Counsel, F.C.C., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice were on the brief, for respondents. Robert B. Nicholson and George Edelstein, Attys., Dept. of Justice, entered appearances, for respondents.

Andrew J. Schwartzman, with whom David William Danner was on the brief, for intervenor, Syracuse Peace Council. Robert M. Gurss also entered an appearance, for intervenor.

Timothy B. Dyk, with whom Andrea Ann Timko, Margaret L. Tobey and Andrienne Masters, for CBS, Inc., J. Laurent Scharff, and James M. Smith, for Radio-TV News Directors Ass'n, et al. and Henry L. Bauman and Steven A. Bookshester, for Nat. Ass'n of Broadcasters were on the joint brief, for intervenors, CBS, Inc., et al.

Bruce D. Sokler, with whom Charles D. Ferris, Frank W. Lloyd and James A. Kirkland, were on the brief, for intervenors, Democratic Nat. Committee, et al.

Howard Monderer and Molly Pauker were on the brief for intervenor, Nat. Broadcasting Co., Inc.

William W. Rogal was on the brief for amicus curiae, American Advertising Federation, urging reversal.

David M. Hunsaker and Denise Boule Moline were on the brief for amicus curiae, Freedom of Expression Foundation, urging reversal.

Ronald Arthur Qumbrun and Sam Kazman were on the brief for amicus curiae, Nancy Gutbrodt and Pacific Legal Foundation, seeking vacatur of the F.C.C. decision and adjudging the fairness doctrine unconstitutional.

Henry Geller and Donna Lampert, were on the brief, for amici curaie, Geller and Lampert urging the rejection of the constitutional challenge of the fairness doctrine.

Daryl Michal Freedman and Charles H. Firestone were on the brief, for amicus curiae, Common Cause, urging affirmance.

J. Clay Smith, Jr. was on the brief, for amicus curiae, Nat. Bar Ass'n, urging affirmance.

Daniel Warshawsky and Douglas L. Parker were on the brief for amici curiae, Nat. Ass'n for Better Broadcasting and the League of United Latin American Citizens, urging affirmance.

Robert T. Perry, was on the brief, for amici curiae, the American Civil Liberties Union, the Office of Communications of the United Church of Christ and the American Jewish Congress, urging the affirmance of the F.C.C. decision and the rejection of the challenge of constitutionality of the fairness doctrine.

Before SILBERMAN and WILLIAMS, Circuit Judges, and JAMESON, Senior District Judge.*

Opinion for the Court filed by Circuit Judge SILBERMAN.

* Of the United States District Court for the District of Montana, sitting by designation pursu-

SILBERMAN, Circuit Judge:

Meredith Corporation ("Meredith") petitions this Court seeking reversal of the Federal Communications Commission's determination that Meredith's television station, WTVH of Syracuse, New York, violated the fairness doctrine. Meredith challenges the agency's action on the grounds that the Commission arbitrarily and capriciously enforced the fairness doctrine and that the doctrine in general and as applied to Meredith violates the first amendment. In response, the Commission and Intervenor Syracuse Peace Council ("SPC") contend that Meredith suffered no aggrievement and thus lacks standing, and that even if Meredith had standing, the Commission properly found that Meredith's broadcasting of certain advertisements gave rise to fairness doctrine obligations. After determining that Petitioner has standing, we hold that although the Commission reasonably interpreted its own fairness doctrine precedents, it failed to give adequate consideration to Meredith's constitutional argument. Accordingly, we remand for further consideration and explanation.

## I.

The fairness doctrine requires licensees (1) "to provide coverage of vitally important controversial issues of interest in the community served by licensees," and (2) "to provide a reasonable opportunity for the presentation of contrasting viewpoints on such issues." *Report Concerning General Fairness Doctrine Obligations of Broadcast Licensees*, 102 F.C.C.2d 143, 146 (1985) [hereinafter "1985 Fairness Report"]. The fairness doctrine issue in this case arose during the summer of 1982 when Meredith's licensed television station, WTVH of Syracuse, New York, broadcast three advertisements sponsored by the Energy Association of New York. SPC complained to the FCC that Meredith had violated the fairness doctrine because the advertisements promoted the Nine Mile II

ant to 28 U.S.C. § 294(d).

nuclear power plant "as a sound investment for New York's future" without presenting opposing viewpoints. SPC alleged that the economic soundness of the nuclear plant was a controversial issue of public importance and to document its claim submitted a number of newspaper articles on the controversy surrounding the plant's construction. In addition, SPC noted that although the New York State Public Service Commission (PSC) had approved construction of the plant before the advertisements aired, that approval was under reconsideration throughout most of the summer. Numerous complaints had been filed with the PSC including petitions signed by over 20,000 citizens, which SPC maintained demonstrated the intensity of opposition to the plant. At the time of the advertisements, the plant was also being scrutinized by the New York State Consumer Protection Board, which ultimately challenged the PSC's approval of the plant in court.

In response, Meredith denied that the advertisements raised a controversial issue. Meredith argued that although the advertisements contained a "tag line" describing Nine Mile II as "a sound investment for New York's future," their main thrust was "the need to eliminate dependence on foreign oil" and "the need for electricity." Moreover, according to Meredith, even if the issue were defined as whether the nuclear plant was a sound investment, that issue was not controversial during the summer of 1982 when the advertisements aired, since the PSC had approved the plant the previous April. As for the newspaper articles submitted by SPC, Meredith contended that all but one were non-contemporaneous, most appearing after the advertisements had aired.

While SPC's complaint was pending during the summer of 1984—after all parties had filed their arguments with the Commission—Meredith aired more advertisements promoting Nine Mile II, but this time provided response time to SPC. In a memorandum opinion and order issued December 20, 1984, the Commission held Meredith had violated the fairness doctrine, finding

that the advertisements had advocated the construction of Nine Mile II as a sound investment, that the economic soundness of the plant was a controversial issue of public importance, and thus Meredith had acted unreasonably in failing to present viewpoints opposed to the plant. The Commission ordered Meredith to explain how it would comply with its fairness obligations.

Meredith filed a timely petition for reconsideration, arguing the Commission had misapplied the fairness doctrine and that overall Meredith had acted reasonably because it offered response time to SPC when it subsequently aired similar advertisements in 1984. After the period for filing petitions for reconsideration, Meredith moved for leave to file a supplemental pleading, which contended that the fairness doctrine violates the constitution both as a general proposition and as applied in this case. SPC objected and asked the Commission to disregard Meredith's constitutional arguments as untimely and otherwise improperly presented. The Commission evidently deferred a decision on whether to grant Meredith leave to file the supplemental pleading until its final decision on reconsideration. While the motion for reconsideration was pending, on August 23, 1985, the Commission released its 1985 Fairness Report.

The Commission's 1985 Fairness Report was a comprehensive reexamination of the public policy and constitutional implications of the fairness doctrine. In the past, the Commission has defended the fairness doctrine despite the first amendment's general prohibition on content-based regulation of speech, arguing that the doctrine is justified in light of the limited availability of broadcast frequencies. The Commission believed through careful administration, the doctrine would increase the flow of diverse viewpoints, assuring that the viewing and listening public received suitable access to the marketplace of ideas. *Id.* at 146-47. The Supreme Court upheld the constitutionality of the fairness doctrine in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371

(1969), reasoning that the doctrine's restrictions on broadcasters' speech rights were permissible because overall the doctrine furthered the paramount first amendment right of the public to be informed. *Id.* at 389–90, 89 S.Ct. at 1806. *Red Lion* was expressly premised on the scarcity of broadcast frequencies "in the present state of commercially acceptable technology as of 1969." *Id.* at 388, 89 S.Ct. at 1805. The Court noted that if experience with the administration of the fairness doctrine "indicates that [it has] the net effect of reducing rather than enhancing the volume and quality of coverage, there will be time enough to reconsider the constitutional implications." *Id.* at 393, 89 S.Ct. at 1808. Recently, the Court reemphasized that the rationale of *Red Lion* is not immutable. In *FCC v. League of Women Voters of California*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Court declined to reconsider *Red Lion* "without some signal from Congress or the FCC that technological developments have advanced so far that some revision of the system of broadcast regulation may be required." *Id.* at 376–77 n. 11, 104 S.Ct. at 3116 n. 11. *See also id.* at 378–79 n. 12, 104 S.Ct. at 3117 n. 12.

In the 1985 Fairness Report, the Commission sought to respond to the Supreme Court's invitation to send it a "signal," finding that the existence of fairness doctrine obligations inhibited broadcasters from presenting controversial issues of public importance. In addition, the Commission found that the explosive growth of information sources—in both traditional broadcasting sources (radio and television) and new substitutes for broadcasting such as cable TV, SMATV, VCRs, and LPTV— made the fairness doctrine no longer necessary to assure that the public has access to

a variety of viewpoints. In essence, the Report found that the "scarcity rationale," which has historically justified content regulation of broadcasting, *see Red Lion*, 395 U.S. at 390, 104 S.Ct. at 3123; *National Broadcasting Co., Inc. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), is no longer valid. Based on these findings, the Commission concluded that the fairness doctrine no longer meets the public interest standard of section 309 of the Communications Act, 47 U.S.C. § 309 (1982),[1] further opining that "[w]ere the balance ours alone to strike, the fairness doctrine would ... fall short of promoting those interests necessary to uphold its constitutionality." 1985 Fairness Report at 156.

The Commission also considered the question whether the fairness doctrine was statutorily mandated by 47 U.S.C. § 315 (1982)[2] or instead an administrative policy that could be modified or eliminated by the Commission. After an extended review of the legislative history of section 315, the Commission concluded only that the pedigree of the fairness doctrine was uncertain. Presumably, it left the question open because it had decided, despite its carefully documented and reasoned conclusions, not to institute proceedings to eliminate or modify the fairness doctrine in light of "the intense Congressional interest in the fairness doctrine and the pendency of legislative proposals." 1985 Fairness Report at 247. The Commission also emphasized that it would continue to enforce the fairness doctrine against broadcasters.

True to its word, two months later, the Commission *denied* Meredith's motion for reconsideration, finding that "nothing in the licensee's petition for reconsideration

1. Section 309 provides in pertinent part "the Commission shall determine, in the case of each [broadcast] application filed ... whether the public interest, convenience, and necessity will be served by the granting of such application...." 47 U.S.C. § 309(a) (1982).

2. Section 315 obligates broadcasters to provide equal time to all legally qualified candidates for public office. 47 U.S.C. § 315(a) (1982). The section also provides that "[n]othing in [this

section] ... shall be construed as relieving broadcasters, in connection with the presentation of newscasts, new documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." *Id.*

and associated filings" persuaded it to alter its earlier finding that WTVH had violated the fairness doctrine. But, the Commission also found that Meredith had subsequently acted in good faith after the complaint was filed by allowing SPC airtime during the summer of 1984, and thus no remedy was called for. In a footnote, the Commission acknowledged Meredith's constitutional claim but declined to rule on it in light of the 1985 Fairness Report and "its conclusion that Congress and the courts are more appropriate venues for reacting to the constitutional questions." Meredith petitioned this Court for review pursuant to 47 U.S.C. § 402(b) (1982).

## II.

At the outset, we confront two threshold issues: whether petitioner has standing and whether section 405 of the Communications Act, 47 U.S.C. § 405 (1982), bars review.

▆ The FCC and Intervenor SPC argue that Meredith lacks standing because it was not aggrieved by the Commission's decision.[3] In effect, their position is that Meredith *won* on reconsideration because the Commission found that the broadcaster had demonstrated "good faith" in carrying out its fairness doctrine obligations. We find this interpretation of the Commission's decision impossible to reconcile with its ultimate conclusion: the Commission's memorandum and order *denied* Meredith's petition for reconsideration. And if that were not enough to make it clear who won and who lost, the Commission's discussion removes all doubt: "Application of [fairness doctrine standards] to the facts and circumstances before the Commission in disposing of the initial complaint required our finding that WTVH had violated the Fairness Doctrine. Nothing in the licensee's petition for reconsideration and associated filings per-

suades us otherwise." At oral argument, counsel for the FCC explained that the language of the order is "very confusing" because "there just wasn't a lot of clear thinking going on at that time." Expressing no view on the clarity of the Commission's reasoning on this issue, we think that the Commission's decision is clear enough. The plain language of the order settles that; the FCC's post-hoc characterization of its holding is wholly unpersuasive.

Even if the Commission did find a violation, the FCC and SPC maintain it was a finding that had no adverse impact on Meredith since the Commission did not order any remedial action. Any future adverse impact, it is argued, is too speculative to warrant review at this time. *Straus Communications, Inc. v. FCC,* 530 F.2d 1001 (D.C.Cir.1976), however, is directly on point. In *Straus,* the FCC found a violation of the personal attack rule but decided not to order a forfeiture under 47 U.S.C. § 503(b), instead merely issuing a warning to the licensee that future violations would "be dealt with accordingly." *Id.* at 1005. We held that the licensee had suffered a "modicum of injury" necessary to support jurisdiction because the finding of a violation—even an unpublished one—becomes a permanent part of the station's record, which is enough of an injury in the context of a statute that provides harsher penalties for repeated violations.

The FCC and SPC attempt to distinguish *Straus* by pointing out that in *American Tel. & Tel. Co. v. FCC,* 602 F.2d 401 (D.C. Cir.1979) we described *Straus* as limited to "inherently coercive determination[s]." *Id.* at 408. They contend that because the Commission's order found Meredith had acted in good faith after the complaint was filed, the Commission's action "can hardly be deemed a 'coercive determination.'"

---

**3.** In our companion case, *Radio-Television News Directors Ass'n v. FCC,* 809 F.2d 860, ("*RTNDA*")—argued the same day as the instant case—where an association of broadcasters asked us to hold the fairness doctrine unconstitutional based on issuance of the 1985 Fairness Report, the Commission welcomed this Court's

review. But here, where the doctrine has actually been applied, the Commission seeks to avoid a ruling on the constitutional issue. We must admit that for the Commission to adopt such a cautious position on the propriety of judicial review here is somewhat puzzling in light of what it argued in *RTNDA.*

But that the Commission thought Meredith's 1984 "good faith" obviated the need for a specific remedy does not alter its conclusion that Meredith had been in violation of the fairness doctrine in 1982. In *A.T. & T.*, we refused petitioner's request that we "selectively ... excise from the order's foundation certain portions it finds objectionable" because the Commission's subsidiary findings standing alone were not inherently coercive—the facts found did not independently constitute a violation. *Id.* at 407. Here, in contrast, Meredith challenges the Commission's *holding*—its determination that Meredith violated the fairness doctrine and its denial of Meredith's petition for reconsideration. Intervenors note that unlike *Straus*, Meredith did not receive an express warning as to future conduct. We, however, do not read *A.T. & T.'s* gloss on *Straus* as requiring an express admonition about future conduct as a prerequisite for standing. The FCC's holding is inherently coercive in the sense that it is binding on Meredith; it is an implicit admonition as to future conduct and could be used against the licensee in a renewal hearing.[4] Thus, under *Straus*, petitioner unquestionably has standing.

█ Intervenor SPC raises an additional jurisdictional argument: that 47 U.S.C. § 405 bars jurisdiction because Meredith did not timely raise its constitutional arguments when it moved for reconsideration.[5] Because the constitutional issue was first mentioned in a supplemental pleading filed two months after the deadline for reconsideration petitions, SPC argues that section 405's thirty-day time limit for petitions for reconsideration, as well as the Commission's own procedural regulations, precluded the Commission from considering Meredith's supplemental pleadings. SPC also argues that these procedural defects prevent judicial review of the constitutional issue. We think it telling that the FCC, whose internal processes these procedural rules are largely designed to safeguard, does not even raise this issue. Presumably, it did not because section 405 has never been construed to be an absolute bar on reconsideration of issues raised after thirty days. *See Greater Boston Television Corp. v. FCC*, 463 F.2d 268, 283 (D.C.Cir.1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972) ("so long as the time for appeal to the court has not expired the FCC has jurisdiction to provide reconsideration in its sound discretion"). Indeed, the Commission's own rules permit parties to file supplemental pleadings after the 30 day limit if granted leave to do so by the Commission. *See* 47 C.F.R. §§ 1.45 and 1.106(f) (1986). Clearly, then, the Commission had discretion to grant Meredith leave to present its constitutional argument.[6] And in its opinion on reconsideration, the Commission exercised that discretion, declining to bar Meredith's constitutional argument on procedural grounds—implicitly waiving the timeliness objection. Instead, the Commission refused to consider the constitutional issue for a substantive reason: because of "the Commission's *Report* and its conclusion that Congress and the courts are more

4. At oral argument, counsel for the Commission argued that the Commission would be estopped, based on its position before this Court, from ever using that finding of a fairness doctrine violation against Meredith in a future proceeding. We doubt that the Commission would be estopped as a matter of law, and we put little faith in the Commission's assurance, since the FCC's position on enforcement is admittedly so heavily influenced by non-legislatively-expressed congressional concerns.

5. 47 U.S.C. § 405 (1982) states in relevant part: A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of.... The fil-

ing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.

6. It is also clear, we believe, that the Commission within its discretion could have denied Meredith leave to file because of procedural defects.

appropriate venues for reacting to the constitutional questions."

Even if Meredith's pleading were procedurally defective, section 405 would not prevent *our* review of the constitutional claim. As a condition precedent to judicial review, section 405 requires only that the Commission have a "fair opportunity" to pass on the issue. *See Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 681 (D.C.Cir.1983). The Commission's discussion of the constitutional claim, albeit cursory, demonstrates the Commission had such an opportunity and reinforces our conclusion that section 405 is not an impediment to review. We therefore find jurisdiction over both the constitutional and nonconstitutional aspects of Meredith's claim that the fairness doctrine was unlawfully applied.

### III.

### A.

Petitioner and amici urge us to reach and decide the constitutionality of the fairness doctrine, contending the doctrine has palpably violated Meredith's first amendment rights. The Commission, however, opposes constitutional review here, instead preferring we review the constitutionality of the doctrine—and presumably declare it unconstitutional—in *RTNDA*, the companion case.[7] Intervenors, besides challenging our jurisdiction, urge caution because, as they warn, a ruling on the constitutionality of the fairness doctrine would have far reaching implications that might threaten the entire public interest concept that presently governs the award of broadcast licenses. If we hold the government may not constitutionally regulate broadcasters' program content by enforcing the fairness doctrine, they ask, would that not implicitly preclude all direct or indirect regulation of program content?

Mindful of our duty to avoid unnecessary constitutional adjudication, *see Ashwander v. TVA*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1935) (Brandeis, J., concurring), particularly when the constitutional question has grave implications, we begin our analysis of the merits by exploring two nonconstitutional routes by which Meredith's petition for review could be granted. If we determine either that the Commission misapplied its own fairness precedent or that it otherwise violated the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* (1982), in enforcing the doctrine, we need not reach the issue whether the application of the doctrine to Meredith violated the first amendment.

■ To establish a fairness violation, a complainant must show that the broadcaster presented only one viewpoint on a "controversial issue of public importance" and "failed to afford a reasonable opportunity for the presentation of contrasting viewpoints." *In re The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act*, 48 F.C.C.2d 1, 10 (1974). On appeal, Meredith challenges only the Commission's finding that the economic soundness in Nine Mile II was a controversial issue. In recognition of the "limitless number of potential controversial issues and the varying circumstances in which they might arise," the Commission has never sought to define just what makes an issue sufficiently "controversial" to trigger fairness doctrine obligations. *Id.* at 11. Instead, the Commission has relied "heavily on the reasonable, good faith judgments of [its] licensees...." *Id.* When it does review a broadcaster's judgments, the Commission's standard is whether the issue "is the subject of vigorous debate with substantial elements of the community in opposition to one another." *Id.* at 12. In making that determination, "it is highly relevant to measure the degree of attention

---

**7.** In *RTNDA*, our per curiam and memorandum opinion issued today, we dismissed petitioners constitutional challenge to the fairness doctrine for lack of jurisdiction but ordered briefing on the question whether the FCC's refusal to proceed to a rulemaking was arbitrary and capricious.

paid to an issue by government officials, community leaders, and the media." *Id.*

Meredith argues that during the summer of 1982, when it aired the advertisements, the economic soundness of the Nine Mile II plant had ceased to be controversial because the New York State Public Service Commission (PSC) had already approved the plant. Based on that premise, Meredith challenges the relevance of the newspaper articles the Commission relied on to demonstrate that Nine Mile II had received considerable attention in the media, since only one of those articles appeared during the summer of 1982. Meredith seems to concede, however, that at some later date the economic soundness of the plant once again became a controversial issue. Most of the articles submitted to the FCC by SPC were prompted by cost overruns during the plant's construction and appeared after September 1982. Meredith's position, then, is that there appeared a brief window during the summer of 1982 when unbalanced presentations of the economic soundness of the Nine Mile II plant should not have triggered fairness doctrine obligations.

The Commission has twice considered and rejected Meredith's argument. The Commission found that the controversy over Nine Mile II was ongoing and did not terminate just because the PSC granted initial approval in April 1982. The PSC's decision was under reconsideration during most of the following summer, and the NYS Consumer Protection Board was investigating possible legal challenges to the

PSC's approval. Unlike *In re Yes to Stop Callaway Committee*, 98 F.C.C.2d 1317 (1984), the principal case relied on by Meredith, approval of a power plant by a regulatory body did not end the controversy surrounding the plant's construction.[8] Since the Commission found that the controversy over the economic soundness of Nine Mile II was ongoing, it rejected the notion that articles appearing before and after the summer of 1982 were "noncontemporaneous." The Commission concluded there was abundant relevant evidence establishing that the issue was still controversial.

█ In reviewing the Commission's mixed factual-political finding that the economic soundness of the nuclear plant was "controversial," "[w]e are mindful that the Commission's task in administering the fairness doctrine is one of great delicacy and difficulty, and that the Commission's experience in this matter accordingly is entitled to 'great weight.'" *American Sec. Council Educ. Found. v. FCC,* 607 F.2d 438, 447–48 (D.C.Cir.1979) (quoting *Columbia Broadcasting Sys. v. Democratic Nat. Comm.,* 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973)). Applying that deferential standard here, we have no doubt the Commission's application of its fairness precedent must be sustained. The FCC's opinion thoroughly explained its conclusions and persuasively distinguished the cases cited by Petitioner. We find no basis for disputing the Commission's determination that the issue involved here was "controversial."[9]

---

8. *Callaway* involved similar facts, but the issue there—defined as "the need for, and the desirability of the Callaway nuclear plant"—related to the pendency of ballot resolutions that would have forbade construction of the plant and Public Service Commission proceedings that had resolved the issue of need as a matter of law. *Callaway,* 98 F.C.C.2d at 1319. When the "pro-nuclear" advertisements aired, construction of the plant had been authorized and substantially completed, and the Commission was presented with insufficient evidence to conclude that the "need" issue continued to be a subject of vigorous debate. *See id.* at 1323–28. Also, as the Commission notes, *Callaway* explicitly left open

the possibility that the need for a nuclear power plant might continue to be controversial after regulatory approval. *Id.* at 1327.

9. A judgment as to when a public issue is "controversial" is the sort of political determination that an undemocratic judiciary must be especially hesitant to make. Without intimating a view on the constitutionality of the fairness doctrine—the legitimacy of the Commission itself scrutinizing program content—we note our reluctance as a prudential matter to delve into determinations that do not readily lend themselves to principled review.

### B.

The Commission, it will be recalled, denied Petitioner's motion to introduce additional legal arguments challenging the constitutionality of the fairness doctrine in general and as applied to Meredith because the Commission viewed the Congress and the courts as "more appropriate venues for reacting to the constitutional question." The Commission simply refused to face the merits of Meredith's defense, assuming, we must conclude, that it had no responsibility to do so.

Although Meredith before this Court challenges the constitutionality of the Commission's decision, it does not squarely raise the argument that the Commission's failure to address its constitutional argument was itself error. Normally, we would not consider an argument not properly raised by the parties; "appellate courts do not sit as self-directed boards of legal inquiry and research." *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983). But here another even more important principle of judicial restraint weighs upon us. Federal courts traditionally have sought to avoid constitutional questions if at all possible, *see Ashwander,* 297 U.S. at 345–48, 56 S.Ct. at 482–83 (Brandeis, J., concurring), and this constitutional question, as we have noted, has particularly far reaching implications. By holding, as we do below, that the Commission was required in an enforcement proceeding to respond to Meredith's constitutional challenge, we guard against premature or unnecessary constitutional adjudication. As the Supreme Court has observed, "when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem." *CBS v. DNC,* 412 U.S. at 103, 93 S.Ct. at 2087; *see also FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 795, 98 S.Ct. 2096, 2112, 56

L.Ed.2d 697 (1978) (the public interest standard of the Communications Act necessarily invites the Commission to consider first amendment principles). Although the Commission's 1985 Fairness Report would appear to foreshadow its conclusion as to the constitutionality of this enforcement proceeding against Meredith, nonetheless, we may well benefit—in the event of further review—from the Commission's analysis. The Commission might choose to decide the issue narrowly, resting on the particular circumstances of Meredith's case, or if the Commission reasons more broadly, it might explicitly discuss the interrelationship between supposed constitutional infirmities of the fairness doctrine and the basic statutory licensing scheme.[10]

The Commission's 1985 Fairness Report quite clearly determined that the fairness doctrine as embodied in its regulations no longer serves the statutory public interest Congress charges the Commission with advancing and further states that if it were up to the Commission, it would hold the doctrine unconstitutional. That reservation as to its authority is predicated on the well known principle that regulatory agencies are not free to declare an act of Congress unconstitutional. *See Johnson v. Robison,* 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974). But the Commission refused to decide whether the fairness doctrine was self-generated pursuant to its general congressional authorization or specifically mandated by Congress. Of course, the fair inference to be drawn from the Commission's report was that the Commission believed the doctrine was not specifically mandated; otherwise, it would have been irresponsible for the Commission gratuitously to cast constitutional doubt on a congressional command. Nonetheless, because the Commission felt intense political, if not legal, pressure from Congress, it chose not to reach a final conclusion re-

---

**10.** It is, of course, conceivable that the Commission faced with the necessity of responding to Meredith's challenge to the fairness doctrine on the merits would determine to hold, in an adju-

dicatory context, that the doctrine cannot be enforced because it is contrary to the public interest and thereby avoid the constitutional issue.

garding the origins of the doctrine. We think, however, the Commission was obliged to resolve that issue, at least in the context of an enforcement proceeding in which a party raises a constitutional defense.

It is patently obvious that because of non-legislative expressions of congressional concern, the Commission does not wish to weaken enforcement of the fairness doctrine [11]—at least in the absence of a judicial opinion that directs that course. As its general counsel stated at oral argument, "we are not talking law school enforcement, legal textbook arguments; we're talking political reality here." The Commission, however, confuses its quasi-judicial role with its quasi-legislative one. Whether or not it may refuse to initiate a rulemaking in light of its Fairness Report—the question presented in our companion case—it may not simply ignore a constitutional challenge in an enforcement proceeding. The Commission's finding that Meredith violated the fairness doctrine is, under the Commission's rules, a first step that can lead to a license revocation proceeding, see 47 C.F.R. § 1.80 (1985), a formal adjudication under the APA. See 47 U.S.C. § 312 (1982). And in a formal adjudication, an administrative agency is obliged to consider and respond to substantial arguments a respondent presents in its defense 5 U.S.C. § 557(c) (1982); see also

*Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 157, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). To be sure, the Commission has not as yet initiated a license revocation proceeding, but its finding, as we have already noted, has its own coercive impact.

An agency is not required to reconsider the merits of a rule each time it seeks to apply it. Even a duty to provide a full hearing does not preclude an agency "from particularizing statutory standards through the rulemaking process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should not be waived." *FPC v. Texaco, Inc.,* 377 U.S. 33, 44, 84 S.Ct. 1105, 1112, 12 L.Ed.2d 112 (1964); *see also United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956). Here, however, the Commission itself has already largely undermined the legitimacy of its own rule. The FCC has issued a formal report that eviscerates the rationale for its existing regulations. The agency has deliberately cast grave legal doubt on the fairness doctrine and has done so in such a formal fashion that it contends—in our companion case, *RTNDA* —its Report creates jurisdiction for this court to review the legality of the doctrine itself. Arguably then, even had Meredith not raised a constitutional challenge but rather simply contended the

11. If the Commission had concluded that the doctrine was congressionally mandated and properly applied to Meredith, it would, as we have indicated, not have been obliged to reach the constitutional question. On remand, however, that option appears clearly no longer available. Subsequent to the FCC's decision, this Court held in *Telecommunications Research and Action Center v. FCC,* 801 F.2d 501 (D.C.Cir. 1986, *pet. for rehearing en banc denied,* (Dec. 16, 1986), that the fairness doctrine is *not* mandated by statute. After that decision (and after oral argument in this case), Congress made reference to the fairness doctrine in the 1986 Appropriations Act, stating "that funds appropriated to the Federal Communications Commission by this Act shall be used to consider alternative means of administration and enforcement of the Fairness Doctrine and to report to the Congress by Sept. 30, 1987." 132 Cong.Rec. H10619

(daily ed. Oct. 15, 1986). The language does not appear to mandate the fairness doctrine. In a letter to the Court in the companion case *RTNDA,* the Commission points to language in the Conference Report to the Act ("it is the intent of the Conferees that the Federal Communications Commission shall not change the regulation concerning the Fairness doctrine without submitting the required report to Congress on this matter," H.R.Rep. No. 99–1005, 99th Cong., 2d Sess. (1986), *reprinted in* 132 Cong.Rec. H10720 (daily ed. Oct. 15, 1986)), which the Commission describes as similar to the expressions of congressional intent in past reports accompanying appropriations legislation. *See supra* note 8. But at oral argument, the Commission counsel stated in response to a specific question that the language in those committee reports did not bind them legally, only "as a practical matter."

enforcement of the doctrine as against it was per se arbitrary and capricious in light of the Commission's own Report, the Commission would have been obliged to treat that defense on the merits. "If time and changing circumstances reveal that the 'public interest' is not served by application of the regulations, it must be assumed that the Commission will act in accordance with its statutory obligations." *National Broadcasting Co. v. United States*, 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943). We need not decide that issue, however, because Meredith did more; it challenged the constitutionality of the doctrine in general and *as applied to it.*[12] As we have noted, the Commission could have avoided reaching the constitutional challenge if it had held the fairness doctrine violates the public interest standard of the Communications Act, 47 U.S.C. § 309 (1982), but we are aware of no precedent that permits a federal agency to ignore a constitutional challenge to the application of its own policy merely because the resolution would be politically awkward.[13]

Federal officials are not only bound by the Constitution, they must also take a specific oath to support and defend it. U.S. Const. art. VI, cl. 3. To enforce a Commission-generated policy that the Commission itself believes is unconstitutional may well constitute a violation of that oath, but, in any event, the Commission must discharge its constitutional obligations by explicitly considering Meredith's claim that the FCC's enforcement of the fairness doctrine against Meredith deprives it of its constitutional rights. The Commission's failure to do so seems to us the very paradigm of arbitrary and capricious administrative action.

Accordingly, we remand the case to the FCC with instructions to consider Petitioner's constitutional arguments. Of course, the Commission need not confront that issue if it concludes that in light of its Fairness Report it may not or should not enforce the doctrine because it is contrary to the public interest.

*It is so ordered.*

---

**12.** Even if the Commission were not obligated to address the general constitutionality of its doctrine in an adjudication, it clearly had to respond to Meredith's claim that the doctrine could not constitutionally be applied in this case.

**13.** *Motor and Equipment Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095 (D.C.Cir.1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980), is not to the contrary. There, we held that in a proceeding to determine if California's motor vehicle emissions control regulations qualified for a waiver from federal preemption provided by the Clean Air Act, 42 U.S.C. § 7401 et seq. (Supp. I 1977), the EPA was not required to address a challenge to the constitutionality of the California regulations. We reasoned that the scope of the waiver proceeding provided under the statute did not require the agency to review California's decision to adopt the regulations. As we noted, "if petitioners dislike the substance of the ... regulations ... they are free to challenge [them] in the state courts of California." *Id.* at 1105. The petitioner had already had an opportunity to have an agency consider its constitutional claims—indeed the earlier forum was much better suited to the balancing of California's special needs against the petitioner's interests that the constitutional inquiry required. Meredith's constitutional claim, however, directly challenged the FCC's action. There can be no doubt in light of the FCC's lengthy report on the fairness doctrine that the Commission was well-suited to evaluate the merits of Meredith's claim.

Cases such as *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), which permit a court to consider constitutional challenges to a regulatory statute without requiring administrative exhaustion, are also inapposite because here we deal with the constitutionality of the FCC's own policy.